1  DONNA M. MEZIAS (SBN 111902)
   LIZ K. BERTKO (SBN 268128)
2  AKIN GUMP STRAUSS HAUER & FELD LLP
   580 CALIFORNIA STREET, SUITE 1500
3  SAN FRANCISCO, CA 94104
   TELEPHONE: 415.765.9500
4  FACSIMILE:  415.765.9501
   DMEZIAS@AKINGUMP.COM
5  LBERTKO@AIKINGUMP.COM

6  Attorneys for Defendants

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11 | BRIAN ROGERS, an individual, and     | Case No.: 5-14-CV-02069-JGB-SP
   | AMY CASEY, an individual, on behalf   |
12 | of themselves, and on behalf of all   | JURY DEMANDED
   | employees similarly situated,         |
13 |                                       | DEFENDANTS' MOTION TO
   |                    Plaintiffs,        | EXCLUDE THE EXPERT REPORT
14 |                                       | OF DR. DAVID LEWIN
   |        v.                             |
15 |                                       | [Declaration of Ashley J. Keapproth,
   | THD AT-HOME SERVICES, INC. dba        | Request for Judicial Notice, and
16 | HOME DEPOT, a Delaware                 | Proposed Order filed concurrently]
   | Corporation; US REMODELERS dba        |
17 | HOME DEPOT INTERIORS, a                | Date:   June 13, 2016
   | Delaware Corporation; US HOME         | Time:   9:00 am
18 | SYSTEMS INC., an unknown               | Crtm:   1
   | corporation, and DOES 1 through 100,  |
19 | inclusive,                             | Judge:  Jesus G. Bernal
20 |                    Defendants.        | Date Action Filed: July 14, 2014
   |                                       | Date Action Removed: October 6, 2014
21 |                                       | Amended Complaint:  January 29, 2015

22

23

24

25

26

27

28

TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 13, 2016 at 9:00 am in Courtroom 1 of the above-entitled Court, located at 3470 Twelfth Street, Riverside, California, defendants will move to exclude from evidence the Expert Report of David Lewin, PH.D. ("Lewin Report") ssubmitted by plaintiff in support of her motion for class certification on April 26, 2016.

The Lewin Report should be excluded from evidence because it fails to satisfy Federal Rule of Evidence 702.  Specifically, the survey that Lewin relies on in his report was not designed and administered in accordance with generally accepted principles in the field of survey research and Lewin's conclusions in his report are based on implausible and unfounded assumptions and incomplete data.  The defects in the Lewin report are serious and render the expert report of Dr. Lewin unreliable and inadmissible.

The motion is based upon this Notice of Motion, defendants' Memorandum of Points and Authorities, the Declaration of Ashley J. Keapproth, the Request for Judicial Notice, the pleadings and other materials on file in this action, any oral argument that may be presented at the hearing on this motion, and on any other evidence or argument the Court considers appropriate.

The parties have exchanged correspondence on the claims at issue in this motion. *See* Declaration of Ashley J. Keapproth ("Keapproth decl.") ¶ 2.  This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on May 6, 2016.  *Id.* ¶ 3.

AKIN GUMP STRAUSS HAUER & FELD LLP

Dated:  May 16, 2016            By:      */s/ Donna M. Mezias*____
                                         Donna M. Mezias
                                         Attorney for defendant

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................1

II.   BACKGROUND ........................................................................2

    A.    Lewin's Unfounded Beliefs And Material Omissions Regarding The ILYM Survey ........................................................................3

    B.    The Survey Conducted By ILYM ........................................4

    C.    Lewin's Liability Model Ignores Critical Data And Makes Unfounded And Implausible Assumptions............................5

III.  ARGUMENT........................................................................6

    A.    Expert Opinion Must Be Based On Facts Or Data That Are The Product Of Reliable Principles And Methods. .....................6

    B.    The Lewin Report Fails To Comport With Generally Accepted Practices For Survey Research. .........................................8

        1.    The Survey Design Violated Generally Accepted Practices in the Field of Survey Research. .....................................8

        2.    The Survey Was Not Administered in Accordance with Generally Accepted Practices in the Field of Survey Research.11

    C.    Lewin's Analysis Is Fundamentally Flawed .......................15

        1.    Lewin's conclusions are based on incomplete data. .................15

        2.    Lewin's conclusions are based on implausible assumptions ....16

            a.    Lewin's assumptions are contradicted by plaintiff's survey. ..................................................................17

            b.    Lewin's assumptions are contradicted by SC mileage reports. ..................................................................18

        3.    Despite the very low response rate, Lewin failed to analyze non-response bias....................................................21

IV.   CONCLUSION.............................................................22

# TABLE OF AUTHORITIES

Page(s)

Federal Cases

*A&M Records, Inc. v. Napster, Inc.*
114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in relevant part, rev'd on other grounds*, 239 F.3d 1004 (9th Cir. 2001)............................................................20

*Chavez v. IBP, Inc.*
No. CV-01-5093-RHW, 2004 WL 5520002 (E.D. Wash. Dec. 8, 2004) .................26

*Clicks Billiards, Inc. v. Sixshooters, Inc.*
251 F.3d 1252 (9th Cir. 2001) ...................................................................11

*In re ConAgra Foods, Inc.*
90 F. Supp. 3d 919, 949-50 (C.D. Cal. 2015)............................................17

*Daubert v. Merrell Dow Pharm., Inc.*
509 U.S. 579 (1993)..............................................................................6, 12

*Elliot v. Google Inc.*
45 F. Supp. 3d 1156, 1167-68 (D. Ariz. 2014)..........................................12

*Gibson v. Cnty. of Riverside*
181 F. Supp. 2d 1057 (C.D. Cal. 2002) ....................................................12

*IGT v. Alliance Gaming Corp.*
No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7084606 (D. Nev. Oct. 21, 2008) .............................................................................................16, 19

*Kumho Tire Co., Ltd. v. Carmichael*
526 U.S. 137 (1999)...............................................................................11

*Lust v. Merrell Dow Pharm., Inc.*
89 F.3d 594 (9th Cir. 1996) ....................................................................11

*M2 Software, Inc. v. Madacy Entm't*
421 F.3d 1073 (9th Cir. 2005) ................................................................12

*Marlo v. United Parcel Serv., Inc.*
251 F.R.D. 476 (C.D. Cal. 2008), *aff'd* 639 F.3d 942 (9th Cir. 2011)................12, 26

DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN

*Reinsdorf v. Skechers U.S.A.*
  922 F. Supp. 2d 866 (C.D. Cal. 2013) ........................................................ 12

*Rust Env't & Infrastructure, Inc. v. Teunissen*
  131 F.3d 1210 (7th Cir. 1997) ................................................................... 16

*Sirko v. Int'l Bus. Machines Corp.*
  No. CV 13-03192 DMG SSX, 2014 WL 4452699 (C.D. Cal. Sept. 3,
  2014) ............................................................................................................ 18

*Tyson Foods, Inc. v. Bouaphakeo*
  136 S. Ct. 1036 (Mar. 22, 2016) ......................................................... 12, 26

*Vail Assoc., Inc. v. Vend-Tel-Co.*
  516 F.3d 853 (10th Cir. 2008) ............................................................ 12, 26

*York v. Starbucks Corp.*
  No. CV 08–07919 GAF, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011),
  *rev'd on other grounds*, 2012 WL 12507388 (C.D. Cal. Nov. 1, 2012) ............ *passim*

Other Authorities

29 C.F.R. § 541.500 (b), 501(c) ....................................................................... 26

Federal Judicial Center, *Reference Manual on Scientific Evidence* (2011 ed.) ........ *passim*

Federal Rule of Evidence 702 .......................................................... 6, 7, 11, 27

DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN

## I.   <u>INTRODUCTION</u>

In support of her Motion for Class Certification, plaintiff submitted a report from a purported expert witness, Dr. David Lewin, who relied on telephonic survey results and customer appointment data in rendering opinions about the amount of work time putative class members engaged in sales related activity.  *See generally* Expert Report of David Lewin ("Lewin Report") (DE 50-09).  The Lewin Report is fatally flawed in several significant respects.  First, the survey design and administration do not comport with generally accepted survey principles.  Second, Lewin's model for estimating the amount of time spent on sales related activity is statistically inadequate.  Third, Lewin's model is based upon implausible assumptions contradicted by actual data in the record.  These defects render the resulting report unrealiable and inadmissible under Federal Rule of Evidence 702.  *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 & n.9 (1993).

Lewin did not administer or oversee the survey on which he heavily relies for the opinions expressed in the report.  Instead, plaintiff's counsel retained ILYM Group, Inc. ("ILYM"), a settlement administration company with minimal training or experience in survey administration, to administer the survey.  Lewin admitted that he does not know whether the survey was conducted according to required survey principles or complied with accepted principles.  *See* Deposition of David Lewin ("Lewin tr."), attached as ex. 1 to the Keapproth decl., 38:2-10, 39:6-40:16, 100:23-101:8, 104:9-21, 126:23-127:20, 204:7-18.  In fact, both the design and administration of the survey failed to adhere to generally accepted survey principles.

Stephen Smith, a renowned survey expert, reviewed the survey and concluded that (i) "the survey questionnaire does not adhere to current best practices and is likely to have produced data that [have] a high error rate;" (ii) "the response rate for the survey is low and therefore at risk of having non-response errors;" (iii) the Lewin report does not show that accepted survey administration practices were adopted and followed; and (iv) the report does not show that ILYM possesses the "requisite experience and skills to

conduct a survey that follows" accepted survey principles.  *See* Reply to the Report of Dr. David Lewin, dated March 18, 2016 by Stephen Smith ("Smith Report"), ex. 2 to Keapproth decl., ¶ 38.  Further, the testimony of ILYM's witnesses confirmed that the survey administration failed to comply with generally accepted practices in virtually every respect.  *See* Deposition of Lisa Mullins ("Mullins tr.") 40:11-14; 45:21-24; 48:7-49:3; 53:3-7;55:4-24; 57:24-58:11 and Deposition of KerriAnn Manning ("Manning tr.") 19:20-20:5; 32:17-33:16; 34:2-14; 35:10-21, 52:18-53:16, attached as exs. 3 and 4, respectively, to Keapproth decl.

Without verifying the propriety of the survey, yet relying on the results, Lewin purported to estimate the amount of time putative class members spent engaged sales and non-sales activity.  Lewin Report ¶¶ 26-31.  That the Lewin Report is based on an unscientific and unreliable survey is alone sufficient to render it inadmissible.  But it is further deficient in that it is based on implausible assumptions that are contradicted by objective data, including certain survey results and relevant data that directly contradict his opinions.  Given these significant and numerous defects, plaintiff cannot show that the Lewin Report is sufficiently reliable to be admissible under Rule 702, and it should be excluded.

II.    <u>BACKGROUND</u>

Plaintiff retained Lewin to (1) "assess the 'typical' (or average) work week for potential class members," (2) "quantify the amount of time Plaintiffs and the other outside Sales Consultants ["SCs"] spent performing exempt tasks (i.e., outside sales activities) as compared to non-exempt tasks (i.e., non-outside sales activities)," and (3) "review historical compensation of potential class members."  Lewin Report ¶ 13.  In addition, plaintiff requested that Lewin "assist in designing a survey to facilitate the collection of information on the daily/weekly work-related activities of potential class members."  *Id.* ¶ 14.  Plaintiff's counsel provided the draft survey questions to Lewin, appointment data for a sample of 190 SCs, and various declarations from putative class members.  *Id.*; Lewin tr. 25:9-11; 26:12-27:17.

A.   Lewin's Unfounded Beliefs And Material Omissions Regarding The ILYM Survey

Prior to conducting his analysis in this case, Lewin reviewed the survey drafted by plaintiff's counsel.  Lewin tr. 29:3-9; 31:8-15.  ILYM conducted a "pre-test" of the survey with a sample of 15 potential class members.  Lewin Report ¶ 18.  Of those 15 persons, only three completed the pre-test.[1]  *Id.*  Lewin then made recommendations to plaintiff's counsel for "slight" revisions to the survey, but does not know whether those recommendations were implemented.  Lewin tr. 32:11-33:15.

According to Lewin, ILYM then administered the survey to 512 individuals, not including the named plaintiffs and the 15 individuals who were contacted for the pre-test.  *See* Lewin Report ¶ 19.  Lewin did not (i) verify whether ILYM was qualified to conduct the survey, Lewin tr. 39:6-10, (ii) provide ILYM with training or instruction regarding the administration of the survey, *id.* 39:15-40:5, or (iii) provide ILYM with responses to frequently asked questions, *id.* 126:23-127:20.  In fact, Lewin has never spoken with anyone at ILYM and does not know who conducted the interviews.  *Id.* 38:2-10.  Lewin's mistaken understanding was that IYLM is a "consulting firm that administers surveys."  Lewin tr. 37:11-18.  Rather, ILYM is a settlement administrator, and its CEO could identify only two telephonic surveys that ILYM had ever completed, both of which took place four or five years ago.  Mullins tr. 36:17-38:25.

Lewin was also mistaken about other critical aspects of the survey administration, including he "believed" that only one person conducted the interviews (Lewin tr. 39:11-14), that the interviews spanned three weeks (*id.* 40:14-16), that calls were conducted between 9:00 am and 5:00 pm (*id.* 204:13-18), and that ILYM attempted to contact each putative class member three times (*id.* 204:7-12).  He does not know whether the survey interviews were monitored and did not verify that any of the interviews actually took

---

[1]   Lewin states that ILYM was able to obtain responses from four of the 15 individuals.  However, a review of the pre-test results shows that only three persons completed the pre-test.  *See* Pre-Test Survey Results attached as ex. 5 to Keapproth decl.  This is roughly 0.5% of the relevant population.

DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN

1   place.  *Id.* 100:23-101:8.  He also does not know what, if any, measures were taken to

2   ensure the interview responses were accurately reported.  *Id.* 104:9-21.

3         B.    <u>The Survey Conducted By ILYM</u>

4         ILYM is a settlement administration company retained by plaintiff's counsel to

5   administer the survey relied on by Lewin.  Mullins tr. 24:2-4; 43:14-17.[2]  The survey

6   interviews were conducted by two ILYM contractors, Michelle Green and KerriAnn

7   Manning.  *Id.* 49:16-23; Manning tr. 20:22-24; 34:16-18.  Neither ILYM nor the two

8   contractors have any background in scientific survey methodology and ILYM does not

9   require that its employees or consultants have any survey training.  Mullins tr. 40:11-14;

10  Manning tr. 19:20-20:5; 35:10-21.  ILYM and the two contractors did not receive any

11  instructions or training from either Lewin or a survey expert on how to administer the

12  survey, and no instruction on (i) how to record interview responses; (ii) how to respond

13  to questions regarding the survey; (iii) whether to ask respondents to tell the truth and

14  not to guess; or (iv) when to make calls.  Mullins tr. 45:21-24; 48:7-49:3; Manning tr.

15  32:17-22; 34:10-14.  In fact, Ms. Mullins never spoke with Lewin or any member of his

16  staff regarding the survey, and Ms. Manning had only one call (with plaintiff's counsel)

17  in which someone from Lewin's staff was on the call but did not engage in conversation

18  with Manning.  Mullins tr. 45:3-10; Manning tr. 31:6-32-9.  The two contractors were

19  instructed by plaintiff's counsel to leave voicemails if no one answered that they were

20  calling regarding a lawsuit involving sales consultants and Home Depot and to provide

21  plaintiff's counsel's contact information if the respondent inquired regarding the action,

22  Manning tr. 32:23-33:16; 34:2-9.

23        The ILYM contractors administered the survey from March 1 through March 11,

24  2016 and made calls between 9:00 am and 2:30 pm and 6:00 pm and 9:00 pm.  Manning

25  tr. at 54:21-25.  The two contractors summarized the calls in a spreadsheet.  Manning tr.

26  52:18-53-16.  The spreadsheet does not show which contractor conducted the interview

27

28  [2]  ILYM was retained by plaintiff's counsel earlier in this action to administer the
    *Belaire-West* notice.  Mullins tr. 40:18-23.

or what time the interview took place.  *See* Survey Responses, ex. 6 to Keapproth decl.  None of the survey calls were monitored or recorded and the contractors conducted the survey calls from their homes.  Mullins tr. 53:3-7;55:4-24; Manning tr. 55:18-19; 54:19-20; 57:23-25.  Lewin did nothing to supervise the survey.  The survey responses were not checked for accuracy or uniformity and  at the conclusion of the survey, ILYM sent the response spreadsheets to plaintiff's counsel, not Lewin.  Manning tr. 59:5-7; Mullins tr. 57:24-58:11.  Neither Lewin nor anyone from ILYM contacted the respondents at the conclusion of the survey administration  to verify that the interviews actually took place and Lewin did not contact ILYM to ensure that the responses were accurate.  Lewin tr. 100:23-101:8, 104:9-21.

C.    Lewin's Liability Model Ignores Critical Data And Makes Unfounded And Implausible Assumptions.

Lewin relied on the survey responses to determine the "typical work week" for potential class members with respect to "the mix of sales related and non-sales related work."  Lewin Report ¶¶ 13, 26.  He used the survey responses and number of days worked by each SC as shown in the appointment data "to estimate the total number of hours worked in each week" for each SC who appeared in the appointment data.  *Id.* ¶ 28.  However, even where the appointment data show that the SC worked only one to three days during a given week, Lewin assumed that the SC worked four full days.  *Id.* ¶ 27.  Lewin also assumed every SC worked 10 hours each day, even on days where the appointment data show that the SC worked only one appointment.  *Id.* ¶ 28.  Thus, when a sales consultant had only one appointment for the whole week, Lewin assumed the SC worked 10 hours on the day of the appointment plus three additional 10-hour days in the same week.  Lewin assigned a certain amount of sales related time to each appointment and assumed that *all* other time during each 10-hour day was non-sales activity, which resulted in more than 30 hours attributed to non-sales activity in every week with only one sales appointment.  *See id.* ¶¶ 27-29; Lewin tr. 43:5-45:2.  By "adding days of zero appointments," Lewin created "2,111 additional" work days for which he assumed SCs

spent 10 hours engaged in non-sales activity only.  *See* Lewin Report ¶¶ 27, 28; Lewin tr. 45:15-21.

Significantly, although available for his review, Lewin did not consider in his analysis the mileage expense reports data which show the number of days worked by SCs each week and "exactly when" and "how many times" SCs made visits to stores and "where [each SC] was every day."  *See* Lewin tr. 25:9-11; 26:12-27:17; Deposition of Amy Casey ("Casey tr."), attached as ex. 7 to Keapproth decl., 68:10-11; 203:2-6; 235:18-237:13.  He also failed to consider the potential nonresponse bias even though the survey response rate was less than 16 percent.  Lewin Report ¶ 19 at n. 19; Lewin tr. 133:1-17.[3]

III.    <u>ARGUMENT</u>

A.    Expert Opinion Must Be Based On Facts Or Data That Are The Product Of Reliable Principles And Methods.

Federal Rule of Evidence 702 requires that an expert's opinion be "based upon sufficient facts or data" and "the product of reliable principles and methods."  Fed. R. Evid. 702.  The district court has broad latitude in deciding how to determine reliability under this "gatekeeper" function.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 149 (1999) (*quoting Daubert*, 509 U.S. at 592).  At all times, the proponent of the expert testimony has the burden of proving admissibility.  *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

The first step in the Court's analysis of survey evidence is to determine whether the survey is admissible, relevant, and conducted according to accepted principles.  *See Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir. 2001).  "Unless survey evidence is conducted according to accepted principles, [the evidence ] is not

---

[3]  When the lack of response to a survey is not distributed randomly, valid inferences about the target population (here the potential class) cannot be properly drawn.  Thus, it is critical to determine the level of nonresponse in a survey.  *See* Federal Judicial Ctr., *Reference Manual on Scientific Evidence* (2011 ed.) at 383-84, attached as ex. 8 to Keapproth decl.  Where a survey response rate is below 80 percent, the nonresponse bias should be analyzed.  *Id.* at 384, n.110.

DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN

admissible in the first instance." *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878-79 (C.D. Cal. 2013) (citing *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgm't, Inc.,* 618 F.3d 1025, 1036 (9th Cir. 2010)).  The Court must determine whether the preponderance of the evidence shows that the reasoning or methodology underlying expert testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts at issue.  *Daubert*, 509 U.S. at 592- 93.  Where representative evidence is "based on implausible assumptions," such evidence cannot lead to fair and accurate estimates and should be excluded.  *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048-49 (Mar. 22, 2016) (citing *Daubert*).

In applying *Daubert*, courts in this Circuit have excluded expert testimony or declined to rely on the testimony where the methodology was flawed and the results could not be considered reliable.  This is not a matter of weight or credibility; rather it determines whether the survey is admissible at all.  *See, e.g.*, *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485-86 (C.D. Cal. 2008) (in considering motion for class certification, court declined to rely on telephone survey that was not product of reliable principles and methods), *aff'd* 639 F.3d 942 (9th Cir. 2011); *Elliot v. Google Inc.*, 45 F. Supp. 3d 1156, 1167-68 (D. Ariz. 2014) (survey inadmissible where not the product of reliable principles and methods); *Reinsdorf* , 922 F. Supp. 2d at 878-79 (same); *York v. Starbucks Corp.*, No. CV 08–07919 GAF (PJWx), 2011 WL 8199987, at *12-14 (C.D. Cal. Nov. 23, 2011), *rev'd on other grounds*, 2012 WL 12507388 (C.D. Cal. Nov. 1, 2012) (excluding expert reports that departed from established procedures); *Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1067 (C.D. Cal. 2002) ("deficiencies in the design or execution of a survey of individuals is grounds for its complete exclusion"); *Vail Assoc., Inc. v. Vend-Tel-Co.*, 516 F.3d 853, 864 n.8 (10th Cir. 2008) (survey unreliable where design and administration flaws that "stacked the deck in favor of plaintiff"); *M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005)(rejecting survey not conducted in accordance with generally accepted survey principles and results were not used in a statistically correct manner).

1    The survey on which Lewin relies in this report is not the product of reliable

2   principles and methods accepted in the field of survey research.  As shown below, the

3   survey suffers from critical flaws in design, administration, and analysis.  First, the

4   survey, which was drafted by plaintiff's counsel, contained numerous design flaws –

5   flaws that Lewin has criticized as an expert witness in other litigation.  Second, the

6   administration of the survey grossly deviated from generally accepted principles of

7   survey research.  Third, in estimating the amount of time SCs spend on sales activities,

8   which is the centerpiece of Lewin's report, Lewin made unsupported and implausible

9   assumptions regarding the number of days worked each week and the duration of each

10  workday, failed to consider relevant mileage reimbursement reports which, unlike the

11  incomplete appointment data Lewin used, capture the full range of activities engaged in

12  by SCs each day, failed to account for the internal inconsistencies in the survey data,

13  and failed to analyze the impact of nonresponse on the survey results even though the

14  response rate to the survey was extremely low.

15          B.    The Lewin Report Fails To Comport With Generally Accepted Practices
                  For Survey Research.
16

17                1.    The Survey Design Violated Generally Accepted Practices in the
                        Field of Survey Research.
18

     The design of a survey is an essential element in ensuring its adequacy.  *See*

19  *Reference Manual on Scientific Evidence*, at 363.  Lewin agrees that a survey must

20  "adhere to standard survey design methodologies" and be "designed so as to avoid

21  biased responses."  Declaration of David Lewin ¶ 9, *Taylor v. AutoZone, Inc.*, DE 266,

22  No. 3:10-cv-08125-FJM (D. Ariz. Nov. 2, 2011).  The first step in this procedure is to

23  conduct a focus group to "become familiar with the language naturally used by the

24  population to be interviewed."  *York*, 2011 WL 8199987, at *12; *see also Reference

25  Manual on Scientific Evidence* at 388 (focus groups facilitate "the construction of clear

26  and understandable questions").  The next step is conducting a "pre-test" of a sample

27  between 25 and 75 of the potential respondents.  *See York*, 2011 WL 8199987, at *12;

28

1   *Reference Manual on Scientific Evidence* at 388, n. 129.  A pre-test of as few as 25 is

2   sufficient "when the survey uses professional interviewers".  *See Reference Manual on*

3   *Scientific Evidence*, at 388, n. 129.  But when an appropriate pre-test is not conducted,

4   there is meaningful risk the survey will produce inaccurate results because of confusion

5   or other difficulties.  *Id.* at 389; *see York*, 2011 WL 8199987, at *12-13 (striking expert

6   testimony for failure to hold focus group and conducting inadequate pre-test).

7          Lewin did not conduct a focus group and relied on a woefully inadequate pre-test

8   of only three persons.  As a result and as explained below, the survey includes questions

9   which are ambiguous and "likely to be a source of significant error."  *See* Smith Report

10   ¶15.  In his report, Smith describes in detail errors that occur when survey respondents

11   are requested to perform "averaging functions" to estimate work related activities over

12   extended periods of time, as they were asked to do in this survey.[4]  *See* Smith Report ¶¶

13   15-26 (citing numerous studies disfavoring the type of questions in the survey relied on

14   by Lewin).  Smith concludes he is "not aware of any published survey methodological

15   work that supports the question wording used in Dr. Lewin's survey and has been shown

16   to produce accurate data for recalling activities such as those involved in this case."  *Id.*

17   ¶ 26.  In fact, in testimony in a different case, Lewin agreed that the types of questions

18   in the instant survey were improper.  Declaration of David Lewin ¶ 9, *Thompson v.*

19   *Albertson's*, *Inc.* ("Lewin *Thompson* decl."), DE 47 (tab 3), No. CIV 00-656-S-BLW (D.

20   Idaho Mar. 26, 2002).

21          When crucial questions are "sufficiently ambiguous or unclear, it may be the basis

22   for rejecting the survey."  *Reference Manual on Scientific Evidence*, at 388.  In an effort

23   to obtain information about the time SCs spent on certain tasks – the main objective of

24   the survey – respondents were asked to recall information from their "typical" day and

25   week.  The word "typical" appears in all questions from Q3 through Q9, and Q16.  *See*

26

---

27   [4]  Stephen Smith is senior vice president and director, health sciences, at the National
    Opinion Research Center at the University of Chicago.  He has designed and managed
28   survey projects for more than 25 years, many of which have been nationally recognized
    for contributions to research and survey methodology.  *See* Smith Report ¶¶ 1-2.

1    Lewin Report, ex. 4.  As Lewin has acknowledged, "important problems and possible

2    threats to the validity of survey results are introduced by use of the word 'typical'..."

3    *See* Lewin *Thompson* decl. ¶ 9.  This is especially true when asking respondents about

4    activities that span many months and, in some cases, years.  Smith Report ¶¶ 20-26.  It

5    can be difficult for even experienced observers to define a "typical" week; here, there is

6    significant variation in customer demand throughout the year.  Lewin *Thompson* decl. ¶

7    9; *see* Smith Report ¶ 16.  This is because answering questions based upon typicality

8    requires that respondents engage in complex cognitive processes to perform averaging

9    functions, thus causing respondents generally to report "erroneously … the number of

10   hours worked."  Smith Report ¶¶ 17, 22.

11       Such erroneous reporting is exactly what occurred here.  Plaintiff requested that

12   respondents recall their "typical" work week or day going back several years to 2012.

13   When asked how much time they "typically" spent performing certain activities per

14   week, respondents reported that they worked an average of 84 hours per week.  *See*

15   Lewin Report ¶ 20 and n. 21; Lewin tr. 110:23-111:12.  But when asked directly how

16   many hours they "typically" worked per week, the reported average was only 54 hours.

17   Lewin Report ¶ 20.  Lewin admits that it is not "just a few outliers causing [the] large

18   differences" between the answers to these two questions, but he nonetheless uses these

19   results as the basis of his analysis.  *Id.*; Lewin tr. 106:23-107:16.

20       These results demonstrate that respondents were unable to perform the cognitive

21   processes demanded by the word "typical" in the questions.  As Lewin acknowledged,

22   these two questions asked for the same information, but produced significantly different

23   results.  Lewin tr. 106:23-107:16.  With a properly conducted focus group and pre-test,

24   these ambiguous questions would have been excluded or rephrased.  *Reference Manual*

25   *on Scientific Evidence* at 388.  Not only did Lewin fail to conduct a focus group, but in

26   response to his deficient pre-test, did not eliminate questions using the word "typical,"

27   but rather *added* questions using the word "typical".  *Compare* Draft Survey, ex. 9 to

28   Keapproth decl., Q17-19 to Lewin Report ex. 4 Q17-19.  In doing so, Lewin violated

not only accepted survey practices, but also his own expert opinion in other litigation that surveys should "avoid[] using the word 'typical' at all in [] questions."  Lewin *Thompson* decl. ¶ 9; *see* Smith Report ¶ 10 ("I am not aware of any published survey methodological work that supports the question wording used in Dr. Lewin's survey").

2.    The Survey Was Not Administered in Accordance with Generally Accepted Practices in the Field of Survey Research.

Trustworthy survey results require "sound interview procedures … followed by competent interviewers." *Reference Manual on Scientific Evidence*, at 409 (citation omitted).  At a minimum, survey procedures should adopt the following protocols:  the interviewers (1) "must be experts;" (2) should receive detailed written instructions on everything they are to say to possible respondents and how to record responses, and the instructions should be provided to opposing counsel; (3) should be required to call back multiple times at different times and on different days; (4) and should record "verbatim" what the respondent says and what the interviewer says; and (5) respondents should be "unaware of the purposes of the survey or litigation."  In addition, the interviews should be monitored and validated.  *IGT v. Alliance Gaming Corp.,* No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7084606, at *8 (D. Nev. Oct. 21, 2008) (citing *High Sierra Hikers Ass'n v. Weingardt*, 521 F. Supp. 2d 1065, 1075 (N.D. Cal. 2007) (survey that did not comport with proper safeguards found unreliable)); *see Reference Manual on Scientific Evidence*, at 404, 409-10, 412; *Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1218 (7th Cir. 1997) (expert report discounted where survey "was not a double blind survey, did not give adequate instructions to interviewers, did not require recording of verbatim responses … and did not comport with accepted practice for independent validation of the results").

Survey experts often use additional safeguards to ensure reliable survey results such as providing interviewers with responses to frequently asked questions to ensure the survey is standardized and asking respondents to affirm their commitment to telling the truth.  *See York*, 2011 WL 8199987, at *12-13.  Here, Lewin does not even attempt

---

11

to validate the propriety of the survey administration.  Indeed, the administration of the survey failed to comply with *all* of the above generally accepted practices.  *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 949-50 (C.D. Cal. 2015) (excluding report where expert had no basis for concluding survey administration was proper).

First, ILYM are not survey experts.  Having a survey administered by inadequate or poorly trained staff can be a significant source of error in a survey and can "seriously undermine the trustworthiness of any survey."  *Reference Manual on Scientific Evidence* at 409, 410 ("interviewer performance suffers with less than a day of training").  ILYM has no background in scientific survey methodology, had never before administered a survey of this nature, and the two consultants who conducted the survey received no training on proper survey administration procedures.  Lewin tr. 39:24-40:5; Mullins tr. 39:16-40:17; Manning tr. 19:20-20:5; 26:12-14.  ILYM is not a member of the American Association of Public Opinion Research, the leading association for professional survey organizations, and does not market itself as a survey organization.  Manning tr. 40:8-10; Smith Report ¶¶ 36-37.

Second, ILYM received no written instructions on what to say to respondents or how to record their responses.  Lewin tr. at 139:11-20; Mullins tr. 45:11-24; Manning tr. at 29:4-12.  Nor were the interviewers provided responses to frequently asked questions, even though respondents often raise questions when contacted for a survey.  Manning tr. 34:10-14; Lewin tr. 126:23-127:20.  And in fact, survey respondents did ask questions, including whether and when they would be receiving money from the action.  Manning tr. 56:6-9 ("everybody" asked "when do we get money[?]").  The two consultants were unprepared to provide consistent, neutral responses.

Third, ILYM and the respondents were fully aware of the sponsor and purpose of the survey.  Plaintiff's counsel previously retained ILYM to administer the *Belaire-West* notice in this action and then retained ILYM to conduct the survey.  Lewin tr. 103:24-25; Mullins tr. 40:18-20.  Both the interviewers and respondents were also made aware of the purpose of the survey.  The two consultants began phone calls by stating they were

calling "on behalf of a lawsuit against Home Depot" and informed the respondent that they were being contacted as part of a class action lawsuit involving SCs.  Manning tr. 22:7-23:1; Lewin Report, ex. 4.  Respondents also were told that the information they provide "will be used to help resolve this lawsuit" and to call plaintiff's counsel if they had any questions.  Lewin Report, ex. 4; Manning tr. 22:23-23:1; 23:17-22.  Providing all survey respondents with the purpose and sponsor of the survey violated the "critical" requirement that the "introduction be as neutral as possible" to avoid introducing bias. Smith Report ¶¶ 11-12; *see Reference Manual on Scientific Evidence*, at 410-11 ("To ensure objectivity in . . . administ[ering] . . . the survey, it is standard interview practice in surveys conducted for litigation to do double-blind research whenever possible [such that] [b]oth the interviewer and the respondent are blind to the sponsor of the survey and its purpose."); *Sirko v. Int'l Bus. Machines Corp.*, No. CV 13-03192 DMG SSX, 2014 WL 4452699, at *4 (C.D. Cal. Sept. 3, 2014) (excluding survey where indicated that it would be used to support a class action).

Fourth, interviewers conducted calls from 9:00 am to 2:30 pm and 6:00 pm to 8:00 pm and called each respondent only once.  Manning tr. 54:21-25; Survey Results, attached as ex. 6 to Keapproth decl.  SCs work varying schedules and are engaged in sales appointments at different times on different days.[5]  The use of variable call times is a recognized technique for minimizing non-response bias, yet it was not used here.  *See Reference Manual on Scientific Evidence*, at 404 (interviewers should be "required to call back multiple times at several different times of the day and on different days to

---

[5]  These call times cover a significant portion of the period during which current SCs are conducting sales appointments or traveling to and from appointments.  As a result, respondents who completed the survey are likely unrepresentative of the class.  Indeed, some SCs informed the interviewers that they were busy with a sales appointment and did not have time for the interview.  Manning tr. 56:22-57:7.  The survey, however, did not include questions to enable a response bias analysis (*e.g.*, whether the respondent is a current or former SC, whether the SC was on vacation or not working for some other reason, or whether the respondent was terminated by Home Depot).  *See* section III.C.2., *infra*.  In fact, some of these characteristics were voluntarily provided by respondents but, because the interviewers did not record answers verbatim, this information was not captured.  *See* Manning tr. 52:18-53:16.

1   increase the likelihood of contacting individuals … with different schedules").

2       Fifth, the interviews were not recorded and the interviewers prepared *summaries*

3   of answers.  *See* Mullins tr. 55:4-5; Manning tr. 52:18-53:16; 55:18-19.  Therefore, it is

4   impossible to verify that answers were recorded accurately.  In fact, ILYM confirmed

5   that some responses were not accurately recorded.  Specifically, there were numerous

6   typographical errors, respondent names were deleted from the final spreadsheet, and the

7   interviewers did not record questions asked by respondents or reasons respondents did

8   not wish to participate in the survey.  Manning tr. 40:4-9; 48:4-7; 51:10-52:21; 61:8-

9   62:5; *compare id.* 56:6-9 (interviewers asked questions) *with* Survey Results, ex. 6 to

10  Keapproth decl. (no questions recorded).  Moreover, on several occasions respondents

11  indicated that they never engaged in a specific activitiy, such as travel to Home Depot

12  stores, but rather than record that the respondent spent zero hours on that activity, the

13  two consultants left the field blank or inserted "n/a", which was not an answer option.

14  Manning tr. 40:10-41:17.  Nevertheless, Lewin relied on the information ILYM put in

15  the spreadsheet and sent to plaintiff's counsel, and made no attempt to verify whether

16  the information was accurate.  Lewin tr. 100:23-101:8.  Nor could he, because there is

17  no record of the verbatim responses.

18      Finally, the two consultants were not monitored for quality control purposes and

19  no one re-contacted persons after the survey was complete to verify that the interviews

20  actually took place.  Lewin tr. 101:2-5.  Moreover, the survey responses were provided

21  to plaintiff's counsel before being provided to Lewin for analysis and Lewin took no

22  steps to ensure he was analyzing the same survey data as that provided to plaintiff's

23  counsel by ILYM.  Mullins tr. 57:24-58:11; Lewin tr. 100:23-101:8; 104:9-21.  This is

24  an entirely improper chain of custody for the survey results on which Lewin relies.  In

25  short, the survey failed to comport with professional methods governing administration

26  of a survey in virtually every respect.  This "seriously undermine[s] the trustworthiness"

27  of the survey and *requires* the exclusion of Lewin's report.  *See Reference Manual on*

28  *Scientific Evidence* at 410; *IGT*, 2008 WL 7084606, at \*9; *York*, 2011 WL 8199987, at

1  *14 ("expert [witness] cannot adopt another's data without verifying its validity and

2  reliability")(citation omitted); *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896,

3  910, n. 15 (N.D. Cal. 2000) (expert report unreliable where expert had minimal role in

4  overseeing administration of survey), *aff'd in relevant part, rev'd on other grounds*, 239

5  F.3d 1004, 1016-17 (9th Cir. 2001).  Where the survey is conducted at the request of a

6  party for the purpose of litigation, a "heightened standard for validation checks" exists.

7  *Reference Manual on Scientific Evidence*, at 412.  Lewin should have used a third party

8  to conduct an independent validation of a random sample of interviews.  *See id.*  But he

9  did not.

C.   Lewin's Analysis Is Fundamentally Flawed

10

11      Lewin's analysis of the survey results and appointment data is flawed rendering

12  his conclusions misleading and unreliable.  His "representative model" is based upon

13  assumptions that are implausible and that ignore relevant and contradictory data.  And

14  even though the survey response rate was less than 17 percent, Lewin failed to analyze

15  non-response bias to determine if the survey results were reliable.  His analysis has no

16  factual basis and must be excluded for this reason as well.

17      1.   Lewin's conclusions are based on incomplete data.

18      Lewin's analysis is based on HDI appointment data, which plaintiff concedes is

19  incomplete as it does not reflect multiple trips to a single customer and does not capture

20  all appointment activity.  *See* Casey tr. 110:9-111:21 (appointments not assigned through

21  system not reflected in appointment data); Lewin tr. 167:16-21.

22      For example, Casey's mileage reimbursement forms show three separate trips to a

23  single customer.  *See* Casey Mileage Report, attached as ex. 10 to Keapproth decl., at

24  HD-ROGERS-0010685.  Since these three trips were all attributed to a single customer

25  lead number, Lewin's model counts these three appointments as only one.  *See* Lewin tr.

26  at 167:16-21.  In addition, Casey's reimbursement records show that she attended sales

27  appointments that are not included in the appointment data.  *Compare* Casey Mileage

28  Report at HD-ROGERS-0000107 *with* Casey appointment data, ex. 11 to Keapproth

15

decl., at HD-ROGERS-0041061 (lead B2602322 reflected on reimbursement form but not in appointment data).

Based on his analysis of the mileage reports, Dr. Anderson concluded that the average SC made 10.99 customer visits per week (Rebuttal Expert Report of Dr. G. Edward Anderson ("Anderson Rebuttal"), attached as ex. 12 to Keapproth decl., ¶ 9), while Lewin observes an average of only 9.2 such customer visits in the appointment data (Lewin Report ¶ 25).  By using only the appointment data, Lewin undercounts customer visits by nearly two per week.  Anderson Rebuttal ¶ 13; Lewin tr. 165:20-168:4.  And in the survey SCs report a median of 14.5 appointments per week (Lewin Report, ex. 5, q. 13).  Given this significant difference, Lewin conceded that "[i]t may be that the appointment data underestimates" appointment activity, but Lewin took "no steps to try to understand the difference."  Lewin tr. 156:7-157:21.

In sum, it is obvious that the data Lewin relied on does not accurately capture all sales work engaged in by SCs.  Thus, his analysis necessarily misrepresents the amount of exempt sales work and cannot be used to provide accurate estimates of time spent on exempt work.  By contrast, *plaintiff admitted* that the mileage expense reports show all activities engaged in by SCs.  *See* Casey tr. 68:10-1("my expense reports would show where I was every day"); 203:2-6 (reports "will tell us exactly when, how many times" Casey made store visits per week); 235:18-237:13 (a mileage report with only two days meant she worked only two days).  Yet, Lewin entirely failed to consider in his analysis the mileage report data.

## 2.    Lewin's conclusions are based on implausible assumptions

Lewin inflates the number of weeks with at least 50 percent of time spent in non-sales activities by improperly assuming that (1) each SC worked 10 hours each work day; and (2) SCs worked at least four days per week.  Lewin Report ¶¶ 27-28; Lewin tr. 43:5-45:2; Anderson Rebuttal ¶ 14.  Both of these assumptions are directly contradicted by the appointment data, mileage expense reports, and survey results.  The appointment data show each day on which the SC had a scheduled appointment; the mileage expense

reports show each day on which the SC traveled to an appointment, a store, or a branch office.  *See* Lewin Report ¶¶ 25, 27.  The mileage expense reports also show days on which an SC traveled to an appointment that was not scheduled, and thus not shown in the appointment data, such as follow-up trips to a customer's home.  Anderson Rebuttal ¶ 13; Lewin tr. 165:20-168:4; Casey tr. 212:11-18.

However, Lewin did not consider the appointment data or mileage reports when he decided to assume that SCs worked at least four days per week and 10 hours per day.  Indeed, he did not even check if these assumptions aligned with the survey responses or mileage reports.  Lewin tr. 43:5-45:2.  They do not but rather grossly overstate the hours and days worked.  These improper assumptions incorrectly "guarantee" his conclusion that a number of SCs spent less than 50 percent of their time on sales related work.  *See* Anderson Rebuttal ¶ 14.

a.      Lewin's assumptions are contradicted by plaintiff's survey.

Lewin's assumptions conflict with the results of the plaintiff's own survey.  For example, Lewin's model concludes that Barseghian, Adina, Light, Luchay, Mann, Medunjanin, Ngyuen, Owens, Rock, Sandusky, and Shields all spent the majority of their time on non-exempt activities.  Lewin Report ex. 7.  Yet each of these SCs responded to plaintiff's survey indicating that they spent the majority of their time on exempt sales work.  *See* survey data, *compare* (q.7a+ 7b) (time in meetings) + (q.9a+9b+9c+9d+9e+9f) (time in stores) *with* (q.9g+9h+9i) (time in sales).  Lewin concluded that Owens was misclassified in 100% of weeks, but his survey responses indicate that he spent 0 hours per week in meetings (*id.*, q.7a+7b), 0 hours per week in stores (*id.*, q. 9a+9b+9c+9d+9e+9f), and 60 hours per week engaged in sales activity (*id.*, q.9g+9h+9i).  Similarly, with respect to Mann, Lewin's model concluded that she was misclassified in 75% of weeks, but her survey responses show that she spent 2.5 hours per week in meetings (*id.*, q.7a+7b), 2 hours per week in stores (*id.*, q. 9a+9b+9c+9d+9e+9f), and 16.5 hours per week engaged in sales activity (*id.*, q.9g+9h+9i).

In addition, the assumption that SCs work 10 hours on days which they have no appointments, one appointment, or even two appointments, is directly contradicted by survey results. *See* Lewin Report, ex. 5, q. 18-20. For example, the median amount of time SCs reported they spent at Home Depot stores when they had zero appointments was two hours; the mean was 2.5 hours.[6] Lewin Report, ex. 5, q. 18. Lewin concedes this discrepancy between the survey data and the 10-hour assumption, but dismissed it because, per Home Depot's policies, the SC's day "can run from 8:00 in the morning to 8:00 at night." *See* Lewin tr. 181:4-182:8. Lewin's reliance on the policy to justify his implausible assumptions contradicts his testimony in other litigation that reliance by an expert on management policies to support conclusions regarding actual work performed "suggests that he does not realize" that how workers actually spend their time, which is the proper test for exemption, "cannot be adduced or measured by concentrating solely on management policies." Lewin *Thompson* decl. ¶ 27.

Lewin's model also significantly undercounts travel time to sales appointments in contradiction of the survey results. For example, Lewin's model attributes an average of nine hours per week to exempt travel time, while the survey shows a median of 18 hours per week. Lewin tr. 161:24-162:21. Therefore, his model accounts for only half of the travel time that SCs reported and underreports exempt travel time by an average of nine hours each week. *See id.*

b.   Lewin's assumptions are contradicted by SC mileage reports.

Second, Lewin's assumptions conflict with the mileage reimbursement reports completed by the SCs. For example, he concludes that SC Caballero was misclassified

---

[6] Exhibit 5 to Lewin's Report indicates there were 66 numerical responses to q. 18. The actual database reveals that 11 of these responses were either "n/a" or "take day off." These responses indicated that the respondent worked zero hours and would have reduced the mean and median values. *See* Manning tr. 40:13-2. There were instances where the respondent stated things like "I never went to Home Depot," but rather than record a zero, the interviewer left the field blank. *Id.* 41:3-17. Notably, "n/a" or "take day off" was not an option as a response to q. 18. This further demonstrates that ILYM was not trained properly, did not administer the survey properly, and that the process for recording responses was flawed and not properly supervised.

in 81% of weeks.  Lewin Report, ex. 7.  However, Caballero's mileage reimbursement forms reflect that he made *no* store *or* branch visits in many weeks, and only one or two store or branch visits in other weeks.  *See* Caballero Mileage Report, attached as ex. 13 to Keapproth decl.  In other words, they show that Caballero spent nearly all of his time performing sales work.  *See id.*  Lewin admitted that, based upon his 10-hour workday assumption, his model assigned Caballero five or more hours of non-exempt work on days when his mileage reimbursement reports show he engaged only in exempt sales activity.  Lewin tr. 67:7-13; 81:19-82:17; 83:15-2.  Lewin also admitted that, because of this assumption, his model concludes Caballero was misclassified in weeks where the objective evidence demonstrates that Caballero made no branch or store visits.  *See id.* 84:21-85:16; 89:13-90:17.

The mileage reimbursement reports also show that for many weeks where Lewin assumed that SCs worked four days, they actually worked fewer days.  For example, Caballero's mileage reports reveal that for the week September 30 through October 8, 2013, he worked only three days.  *See* Caballero Mileage Report HD-ROGERS-0004741-42.  For the week July 1 through July 7, 2013, his mileage reports show that he worked only two days.  *Id.* HD-ROGERS-0002650.  This is a persistent problem in Lewin's model and demonstrates the unreliability of his conclusions.  *See* Casey Mileage Report HD-ROGERS-0005279-80 (worked only three days); Reeser Mileage Report HD-ROGERS-0006268-69 (worked only three days), HD-ROGERS-0006270-71 (worked only one day), HD-ROGERS-0006276-77 (worked only one day); Marseglia Mileage Report HD-ROGERS-0004585 (two days), HD-ROGERS-0004766-67 (two days); HD-ROGERS-0005604 (three days).[7]

Finally, even plaintiff's counsel agrees that Lewin's assumptions are misleading and reflect an absurd interpretation of the survey questions.  *See* Manning tr. 48:10-49:7. In calculating the amount of time spent in sales meetings each week, Lewin multiplied

---

[7]  Cited pages from the Reeser and Marseglia's mileage reports are attached as exs. 14 and 15, respectively, to Keapproth decl.

the number of sales meetings (survey q.7) by the amount of time spent in sales meetings (survey q. 7a).  Lewin report, ex. 5. note E.  He employs a similar method in calculating time spent traveling to meetings.  *See id.*; question 7b, note E.  But at the deposition of one of the ILYM contractors, both plaintiff's counsel and the deponent stated that such calculations were improper, since the answers to questions 7a and 7b already provided the total weekly time spent in and traveling to sales meetings.  Manning tr. 49:1-7 ("Ms Keapproth:  So Question 7B is the total [weekly] travel time to these meetings?  Mr. Quintilone:  Sounds like 20 hours is the total travel to all the  corporate meetings.   The Witness:  And it says 'in a typical week'").  At the very least, this exchange shows that the survey questions were ambiguously worded.  *Id.* 48:10-15 (Mr. Quintilone:  "The question is how long was the travel to these meetings, which is plural, so 20 [hours] is absolutely an appropriate answer").  At worst, it reveals that Lewin's methodology was, in the words of plaintiff's counsel, "false."  Manning tr. 48:10-49:7.  In short, Lewin's model both "created" additional work days for which SCs were assigned 10 hours of non-sales related activity and artificially extended work days to 10 hours even though the data show that, on many days, SCs either did not work at all or worked fewer than 10 hours.  The four-day workweek and 10-hour day assumptions are central to Lewin's model, but they are directly contradicted by the more reliable mileage reimbursement data and plaintiff's own survey results.  These baseless and implausible assumptions "guarantee" the results that plaintiff wanted and render the Lewin Report inadmissible.[8]

---

[8]   Compounding the fundamental analytical flaws, Lewin also makes many technical and statistical errors.  First, the survey asked SCs for their "average appointment length" and Lewin testified that "average" means "average" and to "average" all appointments. Lewin tr. 193:6-18.  Yet, Lewin only applied the median response of 2.5 hours to some appointments and improperly assumed other appointments lasted only 30 minutes.  *See* Lewin Report ¶ 28, ex. 4.  In addition, the survey failed to ask for the average length of an appointment which results in a sale, but Lewin assigns these appointment types 2.5 hours.  *See id.*  Second, his model includes training workweeks even though SCs were treated and paid as non-exempt for those weeks.  This error increased the number of workweeks that he believed SCs were improperly classified as non-exempt.  *See* Lewin tr. 171:4-173:11.  In fact, 26 of the 95 SCs that the Lewin Report finds as misclassified were paid only for their training period and never classified as exempt (*see* Anderson Rebuttal ¶ 10), yet Lewin found they were misclassified in 100 % of their workweeks.

*See Bouaphakeo*, 136 S. Ct. at 1048-49; *Vend-Tel-Co.*, 516 F.3d at 864, n. 8 (survey was unreliable where survey suffered from design and administration flaws that "stacked the deck in favor of plaintiff").

> 3.   Despite the very low response rate, Lewin failed to analyze non-response bias.

The expert presenting the survey results must "analyze the level and sources of non-response" and "assess how that nonresponse is likely to have affected the results." *Reference Manual on Scientific Evidence* at 383-85; *see also Marlo*, 251 F.R.D. at 486 (excluding report where the expert failed to analyze reason for nonresponse); *Chavez v. IBP, Inc.*, No. CV-01-5093-RHW, 2004 WL 5520002, at *10 (E.D. Wash. Dec. 8, 2004) (failure to record nonresponse rate "weighs against . . . admissibility"); Smith Report at ¶¶ 27-31.  In unrelated litigation, Lewin has recognized that it is "an axiom of survey and interview research that when non-respondents from an original sample constitute a 'large' proportion of that sample, substantial threats exist to the validity of the responses from the 'small' proportion that responds to the survey or interview."  Lewin *Thompson* decl. ¶ 10 (questions reliability of survey where expert did not conduct non-response analysis).  Here, the response rate was less than 15.6 percent, much lower than the 27.8 percent response rate where Lewin criticized the failure to analyze non-response bias.[9]

---

*See id.* at 172:3-18; Lewin Report, exs. 7 and 9.  Third, Lewin selectively decided when to use the appointment data and when to rely on the survey results.  For example, when estimating the amount of weekly sales paperwork, which is considered sales work (*see* 29 C.F.R. § 541.500 (b), 501(c)), Lewin used the median result from the survey (14.5) for appointments per week, rather than the median number from the appointment data (9.0), which he used for all other aspects of his analysis.  By using 14.5, Lewin reduced the amount of time assigned to sales paperwork each week by over one hour due to the unique formula used in his report.  *See* Lewin Report ¶ 30.

[9]  Lewin claims that 86 of 512 respondents who were contacted.  Lewin Report ¶ 19; Lewin tr. 130:4-18.  However, the survey results produced by Lewin at his deposition show that only 80 respondents completed the survey.  *See* Survey Results attached as ex. 6 to Keapproth decl.  He also states that the named plaintiffs and the 15 persons who were contacted for the pre-test were not re-contacted for the final survey.  This also appears to be untrue.  The results show that nine of the 15 were contacted for the final survey and that in one case the interviewer had a 14 minute conversation.  In addition, the results indicate that the interviewers called named plaintiff Casey, but that they were "disconnected."  *See id.*

*Id.* Generally, only "high response rates" of 80 percent or higher "eliminate the need to address the issue of potential bias from nonresponse." *Reference Manual on Scientific Evidence* at 384. Not only did Lewin fail to analyze potential non-response bias, the survey failed to elicit information about the characteristics of respondents to allow such an analysis. *See* Lewin Report ¶ 27 n. 19; Lewin tr. 133:1-17; 134:21-136:12. Without this essential information, it is impossible to assess whether the survey is representative of the potential class. Smith Report ¶ 19.[10]

## IV.  CONCLUSION

For all of the foregoing reasons, the report of Dr. David Lewin does not meet the test of reliability required by Federal Rule of Evidence 702. The Lewin Report should therefore be excluded.

Dated: May 16, 2016                AKIN GUMP STRAUSS HAUER & FELD LLP

By_____*/s/ Donna M. Mezias*_____
                Donna M. Mezias
                Attorney for defendants

---

[10]  Indeed, even Lewin would agree that his conclusions "cannot be accepted unless and until adequate explanation and analysis of the non-respondent threat to or bias affecting [his] 'finding[s' are] fully explained." *See* Lewin *Thompson* decl. ¶ 10.

DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN

## CERTIFICATE OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF SAN FRANCISCO

I am employed in the County of San Francisco, State of California. I am over the age of 18 and not a party to the within action; my business address is: 580 California Street, Suite 1500, San Francisco, California 94104. On May 16, 2016, I served the foregoing document(s) described as:

1. **DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN;**

2. **DECLARATION OF ASHLEY J. KEAPPROTH IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN [WITH EXHIBITS 1 THROUGH 15]; AND**

3. **[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION TO EXCLUDE THE EXPERT REPORT OF DR. DAVID LEWIN,**

on the interested party(ies) below, using the following means:

**All parties identified for Notice of Electronic Filing generated by the Court's CM/ECF system under the referenced case caption and number**

☒ BY ELECTRONIC MAIL OR ELECTRONIC TRANSMISSION. Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent to the respective e-mail address(es) of the party(ies) as stated above.

Jason Richard Webster Cucovatz
Quintilone and Associates
22974 El Toro Road Suite 100
Lake Forest, CA 92630-4961

☒ BY UNITED STATES MAIL  I enclosed the documents in a sealed envelope or package addressed to the respective address(es) of the party(ies) stated above and placed the envelope(s) for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid at San Francisco, California.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 16, 2016, at San Francisco, California.

Jeremias V. Cordero